We will now hear argument in the case of J.B. Carter Enterprises v. Elavon. Mr. Mushkin, right? Yes, sir. Good morning. Good morning. Please proceed. Thank you. My name is Mike Mushkin. I represent ATMMS. With me is my partner, Joe Coppedge. May it please the Court. The standard of review in this case is clear error. And direct evidence of intent is not the standard of the law. And in this case, that was the standard applied by the district court judge. She was looking for direct intent. The case law is clear. Very rarely does someone come up and say, I defrauded you. I did this, I did that. No, they deny. They always deny. Counsel, let me ask you this. Are we reviewing the rulings, the factual rulings of the district court for clear error? Yes, sir. Okay. Negative misrepresentation means there was an oral contract. What did they negatively represent if it wasn't in furtherance of that contract? They promised to be EMV compliant by a date certain. The entire industry changed. And over and over again, they misrepresented to my client. The testimony is unrefuted. They were never trying to be compliant. So every time they said it was a direct misrepresentation. Counsel, what do we do with the conclusion that your client failed to prove damages? I mean, even if we were to agree that there was error on some of the merits of these charges or of these claims, if there's no amount of damages proven, what does it matter? Your Honor, there was clear error. There was no evidence provided to refute the damage testimony. Zero. There wasn't even extensive cross-examination. Elevon knew every penny that ATMMS made. They're the processing bank. Well, I read the district court's conclusion as that the evidence presented wasn't competent evidence, because the witness who, the sole witness who talked about damages, didn't provide any sort of detail to allow the district court to actually verify that the accuracy of the information didn't introduce into the record the source documents and also didn't have any particular expertise in accounting, although I'm not sure that would have strictly been required. So the district court gave a whole laundry list of reasons why I don't find this evidence to be competent. And respectfully, it was clear error. There was no evidence to the contrary. Well, it doesn't matter if there's no evidence to the contrary if the evidence presented isn't competent. Your Honor, if the evidence wasn't competent. Right, so address that point. Why was that error for the district court to say this evidence isn't sufficient? Because it was a mathematical equation. There was no testimony to dispute that $44 million in processing was done. There was no testimony to dispute that there's a small fee charged for each transaction. Mr. Pogey testified in detail of the length of the contracts, the type of revenue, and the amount. And he calculated it to the penny, $5 million and change. Then he had future damages and a monthly calculation as the contracts matured. It's simply error. There's no dispute that those are the numbers. And there was no dispute that those numbers were accurate. The judge just didn't want to listen to this Court's prior ruling and didn't want to award damages. Our brief is pretty clear that we believe that the Court didn't follow the Ninth Circuit's prior directive. Counsel, with respect, I don't think you've answered my colleague's question. The district court found that the testimony that you're relying on now was not competent. Based upon the qualifications, experience, and what was relied upon by your, in quotes, expert, in quotes. It just didn't consider it relevant, didn't consider it competent. So what's your best argument that the district court was wrong in that regard? Tell us about the expertise of the person involved. Tell us about what he looked at and why the evidence that we're talking about here is competent. Mr. Pogey was the general manager of the company. It was his obligation and duty to maintain the records, to track all of the transactional work that went on, and to reconcile each of those transactional documents on a monthly basis. Remember, we rely on Elevon for that information. It's not information generated by us. It's information generated by Elevon. And we, the testimony was clear and concise. This is a mathematical equation. Forty-four million in transactions yields X amount of transactional revenue. And unrefuted. Not a single witness testified otherwise. And if I can, I'll reserve, unless you have other questions. Whatever you want to do. It's your floor. I appreciate it. I want to reserve three or four minutes and I'm at almost ten. You've got six minutes plus. What we're seeking from this Court is fundamental fairness. Elevon did it. There's no question. Negligent misrepresentation was found. In fact, intentional misrepresentations were found. That's not what the district court found. I misspoke. In fact, intentional misrepresentations were made. There's no question that they were intentional. With respect, we respect your role as counsel. We know you're a good advocate. But we have to look at the record. And when we look at the record and we see what was said, we see what the district court said, we have a clear error standard here. What we need you to do, and it's your burden, is to show us why the district court committed clear error. And insofar as the intention of the parties and so on, what you're saying is not what the district court found. The district court considered a variety of evidence, concluded there was no meaning in the minds, concluded a lot of other things that you disagree with. But the nature of our system is such that you now have the burden to show us why the district court, having considered all this evidence, concluded differently than what you did. So maybe take it piece by piece. You say the parties, for example, had a meaning in the minds. The district court found otherwise. What would you point us to in the record that shows that the district court clearly erred in that regard? The clear meaning of the minds was to have EMV capability by the October date. Well, that's what you're saying. What would you point to in the record that would show that the district court, who found to the contrary, was wrong, clearly wrong? Communication after communication promising to be done by then. Meeting after meeting promising to be done by then. Every single thing was based on that date industry-wide, and then eight days before the shift, we're not doing it. That's step one. Step two, intent. Prisbillick testified they were never working to be compliant for our program, for their program, for us. They were never working to be compliant. That's Prisbillick, their witness's testimony.  Forgive me, counsel. Will you give us citations in the record? You bet. To both those points, please. So the first cite in the record is to the intent to keep us as a customer, even though they knew they weren't going to meet the deadline, and that's 7AER1202. Say that again. 7AER1202, 1203. Then the Prisbillick testimony, towards indulgence. And that first citation was the Carmichael testimony. And then the Prisbillick testimony. It's 881. That's ADR881? Yeah, 6AER881. Elevon was never striving to have Commerce STK ready for the EMV deadline. It could be no more clear. Okay, and did not Elevon put people on who disagreed with those two points? No. They did not? They did not. So you're saying that these two points are irrefutable, no dispute whatsoever, the district court was just clearly wrong. And held the matter under advisement for almost eight months. Just missed it, Judge. I don't know how else to describe it. That cannot be more clear. They didn't bring Mr. Prisbillick to the trial to testify. They relied on his deposition. They didn't bring him in. I have five minutes left. Would you talk about the intentional interference claim a bit? I'm sort of wrestling with the legal standard there and how it applies in this particular context. Because as I understand it, you can have intentional interference when you have somebody who has the specific intent to interfere. But also it exists when a person knows that an interference is going to substantially or is likely to occur and yet proceeds with their course of conduct. I assume that you're relying mostly on the second one, that they knew that their conduct was going to interfere with your client's business relationships. Is that correct? Yes. Yes, Your Honor. Boil down for me. What is the interference again that you were worried about? So it's a very interesting point on the facts of this case. Because remember, they know everything. They know every dollar that comes in. They know the source of every dollar, the locations. It's all known. They know that we represent casinos. We're a special category for them. And so now they don't meet that deadline. And we're telling them, meeting after meeting, week after week, we're losing customers, we can't bid new work, we can't promise to be compliant, you're not getting us there. And they admit to that. They admit to knowing that we're suffering. And what's most telling is their own employees wanted to get us relief. They wanted an amnesty for the shift. But the Elevon wouldn't give it to us. And the reasoning is staggering. Because we didn't grow enough in the last quarter. We couldn't. We couldn't promise compliance to our casino customers. It's beyond measure for me. They knew and they decided to work on Canada and ignore what was needed for our client. Now, you're going to hear from them that we could have done this other magical connection, but that's a complete red herring and I'm going to save two and a half, three minutes. Thank you very much, Your Honor. Okay. So now let's hear from, is it Gamby, is that correct? Yes, Your Honor. I'm Sydney Gamby and I represent Elevon, Inc. HMMS wants this court to decide that Judge Dorsey ignored all the evidence and pulled her findings of fact out of thin air. That's what they have to show to be successful on this appeal today. But Judge Dorsey did not ignore all the evidence and get everything wrong. After three days of trial and listening to three live witnesses, two deposition witnesses, and admitting over 100 exhibits into evidence, Judge Dorsey correctly found that HMMS failed to prove its claims, except for negligent misrepresentation. And she supports her findings in a 50-page order that meticulously cites to the trial record. Her findings are reasonable, supported by the evidence, and must be affirmed. And at bottom, Judge Dorsey agreed with HMMS on its primary theory of liability that underlied all of its claims. She found that even if it didn't mean to, Elevon had negligently misrepresented that it would provide a solution comprised of both hardware and software for HMMS to be able to process EMV transactions through Converge by the liability shifting. Counsel, would you please, you heard your opposing counsel cite ADR 1202, 1203, and 881, and vehemently contends that these were uncontroverted, if you will, facts, claims by your people. What's your response to his comment? The first citation is to the testimony of Ms. Lisa Carmichael. She's an Elevon witness. And she admitted that Elevon gave information to HMMS when it asked for it and that they didn't want HMMS to leave. But she didn't say that. Can you talk just a little bit? It's hard to hear you in this particular setting. Apologize. She didn't say that Elevon gave information because it wanted to keep HMMS at all costs. And that's what HMMS is arguing. It's something that the district court, that Judge Dorsey, did not agree with. She didn't buy it. And that's because Ms. Carmichael said that they were bracing for Elevon to leave. They thought HMMS would. They knew that the information they were providing was not making HMMS happy. And they gave it to them anyway because they were partners. They were giving them timelines as those timelines shifted in real time. So if they knew that the timelines they were giving were not true, they were never going to meet them, how is that not fraud? They did not know at the time they were giving them that they weren't going to meet them. They were providing targets. I thought there was evidence in the record that they knew that in terms of the specific functionality that this customer wanted, it wasn't going to happen. So there's a distinction that the district court made between overall providing a solution through Converge, that's Commerce SDK, and pin debit target dates. So one happens before the liability shift and one happens after. With respect to Commerce SDK, that was a software development kit that was being developed by Elevon. And it was not ever striving to be ready for the liability shift. And to analyze Elevon's intent, Judge Dorsey looked at all of this from Elevon's perspective. So from Elevon's perspective, it had had a conversation with HMMS long before EMV when HMMS first integrated to Elevon about options to do so. And this isn't to say that HMMS did anything wrong, but its choices about direct certification versus integrating to virtual merchant were relevant to Elevon's state of mind later. HMMS initially declined direct certification. It didn't want to take on those requirements. And as you've said, those conversations were pre this shift in technology. They were. They were. And so HMMS declined direct certification and went through what later became Converge. So fast forward to EMV, and Elevon's sending a lot of emails about EMV readiness to its customers. And it doesn't specify that Converge, specifically as an integration method, will not be ready. The reason that Judge Dorsey found this was a negligent misrepresentation and not an intentional one is because Elevon didn't even realize that it had misled its customer. On the one hand, it was sending all of these communications to all of its customers. And it didn't temper those by, hey, you're a Class A customer. These are for you. Or you're a Class B customer using Converge to integrate. These are not for you. She found that they should have taken more care in those communications and delivered them to HMMS with some qualifiers. But when it came to the... That would make sense to me, and that does make sense to me to some degree in terms of those broad communications. But also in the record are specific questions from HMMS about the concerns that it was having and being able to function in the new world, right? And there were specific responses to those requests. So you can't just say, well, we were not careful about our general responses when you were giving specific responses to this customer and your client knows the needs of this particular customer. Yes, that's correct. There were also direct communications. And in those direct communications starting back in 2013 and carrying through, Elevon gave moving target development dates. And that was something that was discussed extensively at trial, that these were moving target software development dates. And Mr. Poggi even recognized that he knew that those were moving target shifting software development priorities. He's in the software game. He understands what that means, and he admitted that at trial. But Elevon was simply road mapping its expectations for when it would have things available. In such a huge liability shift, those priorities and those moving targets, they were shifting constantly. But it didn't want to not give that information to HMMS. It wanted to provide it as up-to-date as it was. I just don't see in the record where Elevon was being up front about this is what's the big picture. This is what's going on. I see in the record that Elevon was saying, don't worry about it. It's going to happen. They did say that Converge was going to be ready, and that's where Judge Dorsey identified there was an internal communication problem at Elevon. So Converge could be used a couple of different ways. It could be used off the shelf as a Class A solution where you simply plug it in and go. You don't have your own software that you're integrating to. And instead, HMMS used it as an integration method. And in all of their relationship managers switching over, there was one, Ryan Hicks, that said to HMMS early in 2013 that Converge would be on the target for sometime in 2013, and that moved to 2014 and later to Q1 or Q2 in 2015. Now, those targets did get shifted as time went on. And that's why Judge Dorsey found that it was negligent, because they didn't specify which type of Converge they were talking about, whether it was off the shelf or whether it was the integration method of Converge. And finally, when it did say, we are developing a software development kit in Commerce SDK and had HMMS or let HMMS join that beta program, it started providing those specific target dates for functionality that HMMS asked for in Converge. But Elevon... I guess ultimately I'm just not quite sure how to square the record with the district judge's conclusion that this was just negligence and not intentional misrepresentation. Because if I look at the elements of intentional misrepresentation, I mean, there's two key ones, I think, that the defendant knew or believed the representation was false or had an insufficient basis for making the representation. That latter part seems to be triggered by these set of facts in terms of, we're making representations about timing, but we know in the back room that this is a moving target, that this is probably not going to happen, and yet we're going to say it anyways to quell the concerns of this customer. And then the other element that's really important is that the defendant intended to induce the plaintiff to rely. How is that not met when, aside from the comment, the one comment in the record about we wanted to keep the customer, you could just look at this circumstance and you could look at the business relationship and know, that's got to be the reason they're saying this. There's no other reason to say this. Don't worry about it. This is going to happen. We're going to get the technological fix so that your business model will work with our product. What's the other reason to say that other than to keep them as a customer and get them to rely on you being a good supplier for them? It was about relationship management. That's what Ms. Carmichael and Mr. Morris, whose deposition testimony was read. Okay. So then how is that element not met, the inducement or the intent element? How is that not met if it's relationship management? The intent element is separate from knowing that it was false. Judge Dorsey correctly found that. And the intent element wasn't there because she looked at all of the evidence that Elevon didn't have any reason to want to harm ATMMS. For example, they process transactions together and they both share in those fees. Which element tells me that they have to have a purpose of trying to harm the other party? I don't think that's part of the element. Oh, it's not a specific element. It's just something that she evaluated because there was no direct evidence of fraudulent intent, right? So she looked at the circumstantial evidence and she pulled all of that together to find that there simply wasn't an intent to induce ATMMS's reliance on those statements. In fact, Ms. Carmichael admitted that they thought ATMMS would leave. They were bracing themselves for that. That's on page 1202 of the record and 1203. But didn't you just say in your argument a few minutes ago that they were saying these to avoid that possibility, to get them to stay? No. If I said that, that was a misstatement. They said it even knowing that they would probably leave. They didn't say it to get them to stay. They said it in spite of the fact that they were bracing themselves for ATMMS to leave. They thought they would find another processor. They thought that they would go somewhere else. Or that they would switch to direct certification. And this is where Elevon had its own internal miscommunication. It didn't realize that ATMMS didn't remember it could directly certify. It didn't realize that it had never expressly said you can have EMV by the liability shift date if you directly certify. And that's where Judge Dorsey found it was negligence. Because it was simply the internal departments of Elevon not coordinating. And you can see that when they give Mr. Poggi information on equipment swaps, for example. When Mr. Poggi was upset that he had bought the L5200s and needed to switch to the Ingenicos, Mr. Morris pushed for amnesty for ATMMS all the way to the top of Elevon. He was ultimately denied. But it simply didn't occur to him to tell Mr. Poggi, hey, I know that you had this option in 2011 of direct certification. You could switch to it now and get all the functionality you desire. And it wasn't until ATMMS was in the beta program at the end of 2015 that Eric Prisbillik really drilled down deep with ATMMS about its priorities. This is all very interesting. But as my colleague has pointed out, at the very least, there's negligence. But you've clarified and amplified with the record your client really wanted to keep this relationship. They wanted to say things that would induce the other side to remain with them, rely upon them. And when you know that you can't do it somewhere in the business, and that apparently is cited in the record, and you continue to say that, is that negligence or fraud? Well, Judge Dorsey found it was negligence because she didn't believe necessarily everything that all of the witnesses said at trial. She made credibility determinations. This is where we have to look at clear error. I mean, anybody in this age that has dealt with software knows this is an inexact art. It changes. It's hard to do. And particularly if you're dealing with things that are extremely complex, it can take much longer. What troubles me here is it looks like you've got a relationship. You wanted to keep it. People within your client's business kept saying nice things that lulled the other side into a sense of security and then pulled the plug at the very end. At least that's the allegation. The judge found at least it was negligence. What's your best argument that it's not fraud? Fraud is where you intentionally desire the other person to rely upon a false claim. Why is this not fraud? She did hear testimony about oral representations that Elevon did tell ATMMS eventually it could directly certify. She just found it was too late, that they didn't realize soon enough that they needed to make that statement. And that's why she didn't find that it was fraud. Because those statements were made in September 2015 in connection with the beta program, but they were too late and they weren't in writing. And she couldn't understand why Elevon didn't tell ATMMS sooner about direct certification, if they could have everything that they wanted, and why Elevon would have any motive or reason to mislead ATMMS when ATMMS could have what it wanted through something else Elevon offered, direct certification. And what was that? What else did they offer that would have solved their problem? Where ATMMS could take its own software and tie it directly into Elevon's processing host, which had the possibility or the capability of processing EMV. And that was offered? It was offered in 2011. And so that's where Judge Dorsey found that Elevon was negligent, because it never reminded ATMMS of that option. From Elevon's perspective, it was ready in 2013 because its host could process EMV, but it never told ATMMS, hey, you might want to think about your integration method, because Converge is not going to be ready, but you can have this through direct certification. And there was simply nothing in the record that she could determine that that was made intentionally to harm ATMMS. If Elevon has the ability to give something to ATMMS that can allow ATMMS to have what it wants, why wouldn't it just tell them? And she determined, based on all of the testimony she heard and all of the exhibits that she looked at, that they just didn't realize they had misled ATMMS in the first place and that they needed to make that representation to ATMMS. Counsel, you said that the district judge did not accept all the testimony or rejected some testimony in determining whether certain representations that were false were intentional. But it seems like some of that testimony comes from Lisa Carmichael, who is Elevon's vice president. So I don't see how that advances your argument, because if Elevon presented testimony that they were, through Carmichael, that they were saying the product would be ready by the EMV deadline and it was to ensure that ATMMS would remain their client, how does that become a rejection of testimony or a credibility determination? I see that my time has run, but I'd like to answer the question. Go ahead and answer your question. So there's a precise point of Ms. Carmichael's testimony on page 1202 where she says, we didn't want to lose them as a partner. Of course we didn't, but we were bracing ourselves for them to leave anyway, because we were giving them this information as a partner. And that doesn't, that didn't convince Judge Dorsey that Elevon meant to keep ATMMS at all costs. She found that they simply didn't realize what more they needed to tell ATMMS. Now, there are other places where there was also credibility determinations made for Ms. Carmichael's testimony. For example, Judge Dorsey saw that there was a bit of a dispute over when PennDevitt specifically was available, and she didn't necessarily believe that Elevon had been telling ATMMS behind the scenes in oral phone calls, that it could have everything that it needed by directly certifying. So those were some of the credibility determinations that she made. She also determined that Mr. Poggi wasn't credible when he flipped on the stand and said, different than in his deposition, that he believed that all of these representations were intentional. In deposition, he had acknowledged that they were communicating about the software environment, and he didn't believe that there were any intentional misstatements, and that Elevon probably thought its statements were partially true, indicating he knew there was some level of doubt there. Can I? Go ahead. I want to put a very fine point on it. On page 35 of the record, the district court finds that an Elevon employee testified it never intended to achieve what ATMMS wanted by October 2015. With that finding, how is it legally possible to say that there wasn't fraud in this case? So this has to do with the specific product commerce SDK. It was not striving to have that ready by the liability shift deadline, and there are no representations in the record that that specific product would be ready by October 2015. It was the totality of the representations that Judge Dorsey found were wrong and were false, right, that Elevon would have something available for ATMMS, some product available by the liability shift deadline.  Other questions about my colleague? Thank you for your testimony, or your argument, excuse me. All right. Mr. Mushkin, you have a little time for rebuttal. Thank you, thank you, and thank you. Your Honor, you hit it square on the head. How can Prisbelic testify that they were never striving, yet month after month, year after year, we're going to get it done? It doesn't make sense. And there's further proof in the record, because there was a sit-down, and it was recorded, and it was sent to Elevon, and they didn't dispute the content of the meeting, and they were still promising SDK to be available. I warned you there would be a red herring. Nowhere in the record did Elevon ever offer ATMMS direct certification. They sold them SDK. They sold the virtual merchant. They selected the machinery, and they selected every step in the chain. And to now come before this Court and say we could have somehow fixed it ourselves, it's just a preposterous notion. Any date they provided was a fraud because they weren't trying to get it ready, by definition. What was the oral contract? We're going to have a product for you. It's all there. The elements are there. The date, the product, the functionality, it's all there. I want to just end on one word.  They used it. It's in the materials that we're partners. This isn't how you treat a partner. It's wrong. It's fraud. And it was intentional conduct. It wasn't an accident. They're right. Those dates continued to move, all promising to be ready by the shift date. And then eight days before the shift date, we're not going to make it. It's unconscionable to do that. Fundamental fairness says you can't do that. It's a fraud. And I respectfully submit, and I'll answer any questions you might have. Other questions? Thank you very much. Thanks to both counsel for your argument. The case just argued is submitted.
judges: SMITH, BADE, FORREST